Good morning. May it please the court. Counsel, my name is Joseph Blanton Jr. I'm an attorney in Sykeston, Missouri, in southeast Missouri, and I represent Keller Farms in this appeal. Keller Farms is a corporation that operates farms both in Illinois and in southeast Missouri. Keller Farms was the subject of a herbicide drift in the spring of 2015. One of their neighbors, represented by Mr. Spain, the stewards, because the ground was wet early and you couldn't get in to prepare the ground, hired a crop duster to spray what is called a burndown, which is a combination of chemicals that are intended to kill whatever they touch. And the chemicals were well known. They were Roundup, they were Dicamba, and there was another chemical called Aphoria. Within a week after the crop duster sprayed, the evidence of injury to the Keller Farm, which is about a half a mile to the southwest, became very evident. The farmers, like Keller Farms, hire a wheat scout, and he keeps an eye on the wheat crop, and he noted the herbicide damage. And the evidence was that the damage ran all the way from the target field, where the crop duster had sprayed the burndown, across the neighbors to the southwest, across the ditch, and onto Keller Farms' property. And it damaged not only the crops that were growing, which were wheat, sweet corn, and horseradish, but they also damaged the trees, which are very important and is an important part of our case. The state of Missouri was called, and they came in and investigated. And there is an investigator named Yvonne Barr, and she went around to all the neighbors to try to find out who had sprayed what. And it was very unusual that somebody would spray burndown. So it was an unusual set of circumstances, and it became very obvious that that's where the danger and the injury had emanated from. And so the state of Missouri, ultimately, after all the investigation, found, as a matter of fact, that the crop duster, Mr. McGarity, who had been retained by Mr. Spain's clients, had violated the label. Because if herbicides drift off target, especially this distance, that's by definition a label violation, and they gave Mr. McGarity a warning. Okay, so the damage is to two different types of trees. There are windbreak trees on the south end that are big groves of sycamores and pines, and then also ornamental trees. And we brought a three-count suit, and we initially sued the crop duster, a neighbor from the south who had also received a warning letter, and then we ultimately joined the person who had hired that person. And we named, when we found out who had hired Mr. McGarity, we named them. We settled with the crop duster and the neighbor to the south and went to trial only again. And the other farmer had filed bankruptcy, so we went to trial in three counts against Mr. Spain's clients. Count number one was a negligence per se claim, with the theory being that if the Missouri Pesticide Act was violated, that necessarily creates liability, a common law negligence. And then we brought an action under the Missouri Statutory Trespass Statute, and it is a very old statute. It's been amended many times, and we brought claims both for the crop damage and the damage to the trees under that statutory trespass. And it's easier to prove trespass than it is because certainly the common law negligence, because we didn't have to prove any negligence. We just had to prove that an action taken by Mr. McGarity, who was hired by Mr. Spain's clients, damaged crops and trees. The district court, before we started the trial, when she was considering the jury instructions, indicated that she did not believe that the damage to the crops was covered by the statutory trespass claim, so she indicated she wasn't going to submit that. She did indicate that she thought that damage to the trees was covered, and that it would be submitted, and if we prevailed on that, that there would be trebling, and that's one of the reasons why you go under that theory. But then shortly before the case was actually submitted, she changed her mind and said, no, I don't think you have the right kind of evidence. So what we're here today to talk about is we believe the district court incorrectly entered a judgment as a matter of law on failing to submit the statutory trespass claim, both as to the growing crops and to the trees, and her analysis was different on those. Counsel, I'd like to start with the trees. What evidence did you provide regarding the damage to the trees, and why is it sufficient under Missouri law? Okay. We, first of all, there was damages from witnesses who said, I looked at the trees and they were fried on the northeast side, and that was at the time of the incident. We also hired an arborist to begin looking at the trees. I was contacted about a month after all this happened, and we believed that the trees were going to be injured. We had an arborist who's a former chief arborist from the Missouri Department of Conservation, and he looked at the trees serially over time and determined that some of them had been killed, some of them were going to die, and some of them were going to be okay. And he kind of evaluated this over three or four different times. He made visits, and at the trial he testified that some of the trees had been killed, some of them were going to die, they weren't going to make it, and then some of them, because of all the rain, we had a lot of rain that year, were going to be okay. In terms of the windbreak trees, we had, he also looked at those and believed that what had happened to those, there were big blotches of them that were dead. And there were hundreds and hundreds of trees. And so he testified that there was herbicide damage as to those trees, and then we had a local tree guy, David Bissel, come in, and he actually went by and counted the ones that he, not the ones that had fallen over that rolled, but the ones that could be tied to this incident. He counted, so there were a bunch of trees that were killed. Well, how did he determine the value? Well, it was different for the two different types of trees. As to the windbreak trees, those can be replanted, and so that was Mr. Bissel, who is a landscape guy, said here's what it would cost to replant these trees, the pines and the sycamores. And the Missouri cases allow for that when the damage is relatively insignificant to the whole property. As to the ornamental trees, what Mr. Fleming used is called the trunk formula method, which basically what it does is he evaluates the tree as it would have been before the injury, and he was able to do that by looking at how long the twigs were, and he testified as to how he did that. And then he determined what they were like afterwards, and the difference is there is the book, the trunk formula method by the American Agronomist Association, and it provides a formula for determining the loss of value to the real estate. So that goes to the diminution in the value of the real estate, is that right? Not market value of the trees in a severed condition. Right. But the diminution in market value. What the trunk formula method purports to do is to value how much a tree contributes to the landscape, and what's important about the ornamental trees is that they were specifically left when Mr. Keller's company purchased this farm. They're in about a four or five acre area. It's like a park. Some of these trees are 100, 150-year-old oak trees. So they're not just regular trees. They're ornamental trees, and that's how they were valued. So counsel, help me understand. Was the evidence that was provided below sufficient to determine both the replacement value and the diminution value? I think that was the district court's problem because they didn't think they had both. Actually, what the district court did is, as to both trees, she said, and she looked at a case called Tong, and what it said is you have to know what their value is in a severed state, and then you compare that with diminution in value of the real estate. But that's really not, couldn't be applicable here because they weren't severed. They were injured by herbicides. But in that case, they were, in fact, severed. So maybe the general rule is rather than severed, injured, and what their value would be in their injured state. You see what I mean? I mean, the reason the word, I think the word severed was used in that case was because it was appropriate to that case. And then it sort of got insinuated into the case law, if you see what I mean. We think that's exactly right, Your Honor. We think she kind of, you know, your typical trespass case in Missouri is where Farmer A gets on somebody else's land. He thinks of land somewhere else and cuts down a tree, and he shouldn't have. This is a different situation. We think it's clearly covered within the statutory trespass deal. But what the court said is you didn't give evidence of the trees in their severed state. Well, they weren't severed. The other problem with that as to the windbreak trees is that actually Mr. Fleming had been asked, do these things have any value? And he said, no, just as pulp would. You know, you could burn them in your fireplace. So there actually was evidence in their damaged state of what their value was, and it was nothing. And so the only way that Keller Farms could receive recompense for the damage to the windbreak trees would be the replacement cost. You could replant these things, and that's what the evidence was, and it's appropriate under Missouri law. As to the trunk formula method, both our expert, Mr. Fleming, and their expert, Dr. Long, who's an arborist from, I believe, the University of Kansas, both testified that the only way you could really value the damage to the ornamental trees is the trunk formula method. These trees were massive. I mean, we submitted the exhibits. They're big, beautiful, park-like trees, and the only way that you can really value the damage to them when something that comes over time is the trunk formula method. And, Judge Arnold, I agree. A lot of the old Missouri cases, we believe that the court inadvertently or improperly took kind of some blurbs out of cases on totally different factual situations, and she essentially said we didn't have the right kind of evidence, and that's why she directed it out. Well, we certainly had the baseline evidence even she said we needed to have on the windbreak trees, and we believe that her ruling was incorrect on the other trees. Given that the jury went against you on the negligence and the negligence per se counts, wouldn't this issue become harmless error? No, I don't believe so because there's no need to prove negligence for a trespass. You would just have to prove that it happened. Although, arguably, the jury found no drift, right? Wasn't there evidence that there was? Arguably. Now, that goes to my second point, which is really important, so I do want to spend a balance of my time on that. The chief of enforcement of Missouri looked at the investigation and found that, more likely than not, Mr. McGarrity, what he had done, he had violated the Missouri Pesticide Act, and that as a matter of fact, the herbicides had, in fact, drifted from the Target Farm onto Keller Farms, and he got a warning letter from that. Defense counsel moved to eliminate that out as it being too, quote, prejudicial, and the district court essentially said that, well, if that comes in, I'm essentially directing a verdict for you, and that is not the analysis under Rule 403. The analysis under Rule 403 is to keep the decision from being made on an improper basis. What could be more proper than having the official at the State of Missouri who has no dog in this fight? He's not a hired expert. He's analyzed hundreds and hundreds of drift claims. Didn't you essentially get that information in through Barr, though? No. In fact, it was the other way around. They were able to use what Yvonne Barr said because she said, well, I don't know where it came from, so they were able to depict that in an argument as the official Missouri version is that they don't know. It was absolutely prejudicial. They were able to misdepict exactly what had happened, and no, we did not get that in, and it was terribly prejudicial to us, and it really gutted our case. I believe I'm out of time. Thank you. Thank you, Mr. Blanton. May it please the Court? Go. Yes, sir. Your Honors, my name is Sam Spang. I represent Colin and Farron and Brandon Stewart. They're some young guys, farmers in Stoddard County, Missouri. I just want to address a couple of things. I might kind of jump all over the place. I apologize if I do that. But I guess the first thing, Judge Grunder, right on with your last comment to Mr. Blanton about the trespass being harmless error, if there was any, which I don't think there was, but the jury found in favor of the Stewarts on negligence and negligence per se, and that's a finding that it just didn't happen. Is it necessarily a finding that it didn't happen, or is it perhaps a finding that they weren't negligent in allowing it to happen? The negligence count is a finding that they weren't negligent, and I think that the negligence per se is a finding that it didn't happen. Why couldn't it be that they didn't believe the damages were proved up? Was there a special verdict or was it just a general verdict? That may well be. In any event, either way, it's harmless error because we win if the damages didn't. Like you said, if it was a finding on all the elements of negligence per se, it would be the same elements as a statutory trespass if you believe that that's. The related issue, the dangerous instrumentality proposition, can it be used in conjunction with the treble damages statute? You're talking about an inherently dangerous activity? Yes. I don't think it can. I raised that. That's a, you know, when I found the Gascon Sage. Is that an independent ground to affirm? Pardon? Would that be an independent ground for an affirmance? Absolutely. I think that at least on the whether or not trespass was, you know, a submissible case. Yeah. I mean, when I ran across that case, I ran across it late. I think it was the morning of the pretrial conference, and I thought, okay, that puts an end to that. There's no punitive damages. There's no reason to, you know, be dealing with treble damages. Does common law trespass survive in Missouri, or do all these statutes supplant it? Do you know? I think it survives. I think there is common law trespass. I mean, if there isn't, I didn't raise it. I'm just wondering, because I wonder, even if the treble damages issue, as you say, renders this particular statute a punitive statute, I wonder why just ordinary damages wouldn't be recoverable. Well, they would if you won. Well, but I mean, the case was submitted on a statutory theory. No. Well, the case was not submitted. That's part of it. I mean, it was brought on that. It was argued on that. That was one of the three, correct? Yeah, but not on just ordinary garden variety trespass. Yeah, it was. Well, I guess you're right. No, it was submitted on a common ordinary negligence rather than trespass. I'm talking about trespass. Yeah, you're right. Okay, thank you. You're correct. You know, I think that before I get into the, you know, the insufficiency of the damage evidence, as you know, the trial court ruled that the damage evidence was insufficient, but I think there's three pretty good reasons why this was never a trespass case in the first place or never should have been a trespass case in the first place. And Judge Arnold, you already hit on one of them, and that is the Gaskissage Electric Cooperative case that just says punitive damages aren't supposed to be used in connection with the inherently dangerous activity. But there's two other reasons that were not the basis but I think are still equally available. The inherently dangerous activity doctrine applies to negligence, and if you look at Missouri approved instructions MAI 31.15, it hypothesizes negligence. And it doesn't talk about trespass or any other tort. And there's no authority that MAI 31.15 applies to anything other than negligence. And if the Supreme Court thought that it should apply to other torts, it would have put it in the notes on use. Bottom line is there's no Missouri cases and there's no cases anywhere that any of us could find where the inherently dangerous activity doctrine is applied to anything other than negligence. The other thing is there's a Missouri case that I think is pretty well directly on point that says the inherently dangerous activity doctrine only applies to bodily injury. It doesn't apply to property damage. There's a case I cited in my brief called Lanero v. Dillick, and it says we find that the inherently dangerous activity exception does not apply when the injured party has not alleged that he suffered physical or bodily harm. So that's the only direction we have on that. So bottom line is inherently dangerous activity only applies to negligence and it only applies to bodily injury and it can't be used as a basis for punitive damages. And those are all reasons that I don't think this was a trespass case aside from the insufficiency of the damage evidence, which was actually the basis of Judge Kreitz-Leone's ruling in this case. When we're talking about the submissibility of the case, Mr. Blanton didn't talk a lot about growing crops. You know, the judge ruled early on that it wasn't submissible under that. The statutory trespass statute applies to a person who digs up, cuts down, or carries away plants. And, you know, Mr. McGarrity in this case did not do any of those things. The court applied the statute literally and said it does not apply. And I don't know that there really is such a thing as being overly literal, and I would point out that there is a separate statute, it's 537.353, which deals with damaging or destroying any field crop and that provides for double damages. And that was not a part of this case, Your Honors. When we're talking about trees, and I think one of you hit on this earlier, the Tong versus Kincaid case was a statutory trespass case just like this one, and it said when the tree has no significant value in its severed state, the measure of damage is the fair market value diminution of the real estate or the cost of restoration, whichever is less, and you need evidence of both so you can determine which is less. And when we're talking about severed state, Judge Arnold, I think you hit on this as well, when we're talking about severed state, we're talking about the value of the tree itself, in its injured condition or in its severed condition, whichever the case may be. In this case, there's no evidence that the trees had any significant value in their severed state. In fact, I think the evidence is pretty clear that they did not. But didn't they say it was pulpwood? It had originally been an old pulp plantation, but it hadn't been used for pulp production in many years, and it was just used as a windbreak. Does that essentially mean it's worthless? Yes. Although I assumed that was the case, but that wasn't really in the record, what pulpwood was selling for. I guess that just means kind of like put it in a shredder sort of thing, literally. Maybe chop it up, maybe use it for firewood. And if there was any value of the wood, of the tree itself, that would be the measure of damages. But since it doesn't have any significant value in and of itself, then we go back to the fair market value diminution of the real estate or the cost of replacing the trees, whichever is less. And when we talk about windbreak trees, the only evidence was of replacing the trees. He went out and said these windbreak trees that are along the south border of the property, the pulpwood trees, it's just the replacement costs. There's no evidence of fair market value diminution of the real estate from the windbreak trees. Counsel, what about the guide for plant appraisal? Wasn't an estimate provided using that source? For the ornamental trees, not the windbreak. See, they used Mr. Bizzle for the windbreak trees, and all his evidence had to do with how many of them were dead and what it's going to cost to replace them. So there's no evidence of fair market value of the diminution. See, we had a bright line between windbreak trees, which were the pulpwood trees on the south border of the property, and the ornamental trees, which in the yard, they had a residential portion with a couple of modest houses that was worth $110,000 or so. The guide for plant appraisal did not apply to the windbreak trees. It only applied to the ornamental. So when we talk about the ornamental trees, Mr. Fleming used this guide for plant appraisal, which, as somebody mentioned, is a way of determining the tree's contribution to the value of the real estate, not the trees themselves. Mr. Fleming used this trunk formula method, which came up with $245,000 worth of damages, and the residential part of the real estate is only worth $110,000. So that didn't make any sense. So he kind of threw out the trunk formula and used some language in the guide for plant appraisal that talked about 20... Actually, the guide says 15 to 20 percent, but he used 25 percent of the real estate. He used the four acres that was residential and the rest of 50 acres of farmland, and he said 25 percent of that, and he came up with $106,500. Bottom line is Fleming's testimony could be seen as competent evidence of the fair market value of the real estate, but there was no evidence of replacement cost. So when it comes to windbreak trees, we had evidence of only the replacement cost, and when it comes to the ornamental trees, we had only diminution of value of the real estate. And under Tong versus Kincaid, evidence of both is necessary. Suppose you just have a Missouri case that says if you just show diminution in value, you can't get to the jury? I don't remember seeing that case. Well, I think Tong versus Kincaid says that. I think that was the other way around. I think they remanded it and said we need evidence of... Wasn't that the other way around? I'm sorry, Judge. Wasn't that a case in which you had evidence of the restoration cost, and there was no evidence of the diminution? I think there was only evidence of one, and they remanded it. Yeah, but it matters, it seems to me, because what you've got here is evidence of diminution in land value, but not evidence of restoration. Why is it not the rule that if I'm a landowner and I introduce evidence with respect to how much my land is diminished, that that's enough, and if you think the restoration costs are less, it's up to you to produce that evidence. I don't know. Tong versus Kincaid is pretty definitive on that. Okay, I'll read it again. In several other cases, I think you're pretty... Thank you. Sorry, Judge. Thank you. I want to move on. I've got about two and a half minutes to just talk about Mr. Slade's testimony. His opinion was that it's more likely than not that some of Mr. McGarrity's roundup in Euphoria got on Keller, and it's based on one sample that was taken from field number nine, which was the closest one to the property. The trial court found that the probative value of that was outweighed by the prejudicial effect and cited analogous decisions in employment discrimination cases that I used, the same cases in my brief that the judge used in her memorandum. In general, there really wasn't a lot to Mr. Slade's testimony. The jury had a lot more information than he did, and the judge thought that the jury might put too much weight on it, which was really nothing to it. I found roundup on your property. You sprayed roundup. Therefore, it's my opinion that it's more likely than not that some of your roundup made it there, and the judge was, I think, well within her discretion in saying that that's just not enough. And whatever probative value it has, if any, is outweighed by the prejudicial effect. So, Your Honors, unless you have any questions, I'll quit early. Very well. Thank you, Your Honors. Thank you. Mr. Blanton, you used up all your time, but if you've got something you really want to respond to, I'll give you one minute. One minute, thank you. Appreciate it. As to Mr. Slade, what actually he did is he looked at the entire investigation, and his investigators had gone around and talked to all the landowners to see if there had been any other possible source. And that's what he does for a living. He's done hundreds and hundreds of these analyses. Nobody's more expert than he is. Nobody's more impartial than he is. He was a key witness. We actually put him on the stand so you can see what he would have said. I think it would have changed the outcome of the case. And under 403, her ruling was incorrect on that. On the trunk formula method, both experts said this is the only way you can value these kinds of trees. And there wasn't any replacement cost evidence because you can't replace 100-year-old oak trees. The cost would be presumably enormous. Sir? The cost would be presumably enormous. Well, you can't find them. You can't dig one up and put it somewhere else. Yeah, you can. I'm telling you. The cost would be enormous is what you're saying. Yes, sir. It would. Yes, exactly. There's no reason for doing that. You're right. So we think we gave exactly the right kind of evidence. Thank you for the additional minute and appreciate the court's time. And we would ask that the case be sent back for retrial on all three counts and with Mr. Slade's letter and his testimony coming in. Thank you. Very well. The court appreciates your arguments and briefing. The case is submitted and will be decided in due course. Thank you.